UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SEUNG PAIK, Derivatively on Behalf of BELLICUM PHARMACEUTICALS, INC., | § § § | Case No.   4:18-cv-02513 |
| Plaintiff, | § § | |
| v. | § § | |
| RICHARD A. FAIR, ALAN A. MUSSO, JAMES BROWN, FRANK B. MCGUYER, REID M. HUBER, JON P. STONEHOUSE, STEPHEN R. DAVIS, JAMES M. DALY, and KEVIN M. SLAWIN, | § § § § § § § | |
| Defendants, | § § | |
| -and- | § § | |
| BELLICUM PHARMACEUTICALS, INC., a Delaware corporation, | § § § | |
| Nominal Defendant. | § § § | DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

**NATURE AND SUMMARY OF THE ACTION**

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Bellicum Pharmaceuticals, Inc. ("Bellicum" or the "Company") against certain of its

officers and directors for violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.  Specifically, between April 2017 and November 2017, the Individual Defendants (as defined herein), issued a series of misleading statements concerning the Company's business, operational, and compliance policies.  These wrongs resulted in tens of millions of dollars in damages to Bellicum's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to tens of millions of dollars in potential liability for violations of federal and state law.

2.      Bellicum is a clinical-stage biopharmaceutical company that focuses on discovering and developing novel cellular immunotherapies for various forms of cancer and blood disorders.  BPX-501 was the Company's most important and advanced drug candidate and would have been Bellicum's first drug to reach the U.S. market.  BPX-501 is an adjunct T-cell therapy administered after allogeneic hematopoietic stem cell transplantation ("HSCT"), also known as bone marrow transplantation.  The drug was designed to improve outcomes for patients undergoing stem cell transplant who lack a matched donor.  Bellicum's goal for BPX-501 was to "expand[] the availability of hematopoietic stem cell transplants to more patients with rare genetic diseases and blood cancers."

3.      Before Bellicum can sell BPX-501 in the United States, it has to receive approval from the U.S. Food and Drug Administration ("FDA").  In order to obtain FDA approval, the Company has to undergo a long, arduous, and expensive process that requires significant tests and trials of the drug.  The first stage in the process is a Phase 1 trial, where the Company tests out a drug's safety, appropriate dosage, and side effects on a small group of people.  This is followed by a Phase 2 trial, which uses a larger group of patients to test a drug's effectiveness

and side effects.[1]   If a drug successfully advances through these two steps, it will then be tested in a Phase 3 study and following that, the drug can be submitted to the FDA for approval.   The Company's press releases indicate that BPX-501 is currently being evaluated in multiple Phase 1/2 clinical trials.

4.      While the Company was conducting various tests on BPX-501, the Individual Defendants routinely touted the success of BPX-501.   In promoting BPX-501, the Individual Defendants made numerous improper statements in support of the drug.   The Individual Defendants failed, however, to disclose any negative information about the drug and its adverse effects in clinical trials.   Specifically, they did not disclose to the public that BPX-501 was causing encephalopathy, a brain disease that alters brain function or structure.

5.      In addition, in 2017, the Director Defendants issued a materially misleading Proxy Statement (the "2017 Proxy"), urging stockholders to vote to reelect certain of the directors and approve an equity incentive plan, among other things.   In seeking stockholder votes in accord with the Bellicum Board of Directors' (the "Board") recommendations, the 2017 Proxy highlighted that the Board engaged in operational risk oversight and the Audit Committee exercised oversight of the Company's financial statements and public disclosures.   Through these statements, certain of the Individual Defendants misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to identify and address wrongdoing; (ii) was well informed of the Company's financial condition through myriad information channels; and (iii) promoted prudent risk management practices.   In reality, the Board and Audit Committee did not exercise active and appropriate oversight over

---

[1] Sometimes a company combines the clinical trials.  Bellicum took this approach with BPX-501, combining Phase 1 and Phase 2.

the Company's corporate governance, risk management, and financial statements.  As a result of these misleading statements, stockholders voted in accord with the Board's recommendations to reelect certain directors and approve the proposed equity incentive plan.

6.      On January 30, 2018, after the market closed, Bellicum issued a press release announcing that the FDA would be placing a clinical hold on the Company's BPX-501 clinical trial, due to three cases of encephalopathy deemed as possibly related to BPX-501.  This was the first time that the public was told about the serious adverse events that were associated with BPX-501.

7.      In the wake of this news, the Company's market capitalization fell more than 25%, over $70 million, in a single day.  Moreover, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the United States District Court for the Southern District of Texas on behalf of investors who purchased Bellicum's shares (the "Securities Class Action").  The Securities Class Action alleges violations of the federal securities laws in connection with certain false statements concerning the business, operations, and management of Bellicum.

8.      Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court also has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Bellicum maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Bellicum, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Seung Paik was a stockholder of Bellicum at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Bellicum stockholder.

**Nominal Defendant**

13.     Nominal defendant Bellicum is a Delaware corporation with principal executive offices located at 2130 W. Holcombe Boulevard, Suite 800, Houston, Texas.  The Company is a clinical-stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies for various forms of cancer, including both hematological cancers and solid

tumors, as well as orphan inherited blood disorders.  As of December 31, 2017, Bellicum had approximately 137 employees.

**Defendants**

14.     Defendant Richard A. Fair ("Fair") is Bellicum's Chief Executive Officer ("CEO"), President, and a director and has been since January 2017.  Defendant Fair is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Fair knowingly, recklessly, or with gross negligence made improper statements in Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Defendant Fair also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2017 Proxy.  Bellicum paid defendant Fair the following compensation as an executive:

| Year | Salary | Option Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $494,532 | $3,839,408 | $534,731 | $13,791 | $4,882,462 |

15.     Defendant Alan A. Musso ("Musso") is Bellicum's Chief Financial Officer and Treasurer and has been since November 2014.  Defendant Musso is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Musso knowingly, recklessly, or with gross negligence made improper statements in Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Bellicum paid defendant Musso the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $385,000 | $104,175 | $360,046 | $78,829 | $47,919 | $975,969 |

16.     Defendant James Brown ("Brown") is Bellicum's Chairman of the Board and has been since December 2014 and a director and has been since November 2011.  Defendant Brown is also a member of Bellicum's Audit Committee and has been since at least April 2017. Defendant Brown knowingly or recklessly made improper statements in Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Defendant Brown also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2017 Proxy.  Bellicum paid defendant Brown the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $81,000 | $66,787 | $147,787 |

17.     Defendant Frank B. McGuyer ("McGuyer") is a Bellicum director and has been since March 2009.  Defendant McGuyer knowingly or recklessly made improper statements in Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Defendant McGuyer also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2017 Proxy.  Bellicum paid defendant McGuyer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2017 | $43,500 | $66,787 | $110,287 |

18.     Defendant Reid M. Huber ("Huber") is a Bellicum director and has been since October 2014.  Defendant Huber knowingly or recklessly made improper statements in Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Defendant Huber also negligently violated section 14(a) of

the Exchange Act by making misleading statements in the Company's 2017 Proxy.   Bellicum

paid defendant Huber the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | All Other | Total |
| --- | --- | --- | --- | --- |
| 2017 | $59,500 | $66,787 | $2,384 | $128,671 |

19.   Defendant Jon P. Stonehouse ("Stonehouse") is a Bellicum director and has been

since December 2014.   Defendant Stonehouse is also a member of Bellicum's Audit Committee

and has been since at least April 2017.   Defendant Stonehouse knowingly or recklessly made

improper statements in Bellicum's press releases and public filings concerning the safety and

efficacy of the Company's lead product candidate, BPX-501.   Defendant Stonehouse also

negligently violated section 14(a) of the Exchange Act by making misleading statements in the

Company's 2017 Proxy.   Bellicum paid defendant Stonehouse the following compensation as a

director:

| Fiscal Year | Fees Paid in Cash | Option Awards | All Other | Total |
| --- | --- | --- | --- | --- |
| 2017 | $62,500 | $66,787 | $3,436 | $132,723 |

20.   Defendant Stephen R. Davis ("Davis") is a Bellicum director and has been since

July 2015.   Defendant Davis is also the Chair of Bellicum's Audit Committee and a member of

that committee and has been since at least April 2017.   Defendant Davis knowingly or recklessly

made improper statements in the Bellicum's press releases and public filings concerning the

safety and efficacy of the Company's lead product candidate, BPX-501.   Defendant Davis also

negligently violated section 14(a) of the Exchange Act by making misleading statements in the

Company's 2017 Proxy.   Bellicum paid defendant Davis the following compensation as a

director:

| Fiscal Year | Fees Paid in Cash | Option Awards | All Other | Total |
| --- | --- | --- | --- | --- |
| 2017 | $55,000 | $66,787 | $7,185 | $128,972 |

21.    Defendant James M. Daly ("Daly") is a Bellicum director and has been since May 2016.  Defendant Daly knowingly or recklessly made improper statements in the Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Defendant Daly also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2017 Proxy.  Bellicum paid defendant Daly the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | All Other | Total |
|---|---|---|---|---|
| 2017 | $37,625 | $66,787 | $2,093 | $106,505 |

22.    Defendant Kevin M. Slawin ("Slawin") was a Bellicum director from July 2004 to June 2017; Chief Technology Officer from February 2006 to December 2016; Executive Chairman from February 2006 to April 2014; Chief Medical Officer from February 2006 to March 2015; President from September 2004 to November 2011; and Chairman of the Board, CEO and Secretary from September 2004 to February 2006.  Defendant Slawin cofounded Bellicum in July 2004.  Defendant Slawin knowingly or recklessly made improper statements in Bellicum's press releases and public filings concerning the safety and efficacy of the Company's lead product candidate, BPX-501.  Defendant Slawin also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2017 Proxy.  Bellicum paid defendant Slawin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | All Other | Total |
|---|---|---|---|
| 2017 | $20,000 | $316,347 | $336,347 |

23.    The defendants identified in ¶¶14-15 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14, 16-22 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶16, 19-20 are referred to herein as the "Audit

Committee Defendants."  Collectively, the defendants identified in ¶¶14-22 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

24.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Bellicum and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Bellicum in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Bellicum and not in furtherance of their personal interest or benefit.

25.     To discharge their duties, the officers and directors of Bellicum were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Bellicum were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)      remain informed as to how Bellicum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(e)      truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Bellicum's Code of Business Conduct and Ethics**

26.      The Company has adopted a Code of Business Conduct and Ethics (the "Code"), which applies to all of the directors, officers, and employees of the Company.   The Code mandates that the Individual Defendants' activities comply with the law.   Specifically, the Code states:

> **Legal Compliance**
>
> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold or provide access to periodic training sessions or relevant education in order to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below).

27.      In addition, Bellicum's Code provides that the Company's employees, including its directors and officers, who contribute in any way to preparing or verifying reports filed with the SEC, ensure that Bellicum's disclosures are "accurate and transparent and that [the Company's] reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of [Bellicum's] business and finances and the quality and integrity of [its] accounting and disclosures."   With respect to disclosures, Bellicum's Code states:

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing periodic and current reports that we file with the Securities and Exchange Commission ("**SEC**"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

**Additional Duties of the Audit Committee Defendants**

28.     Under the Bellicum Board's Audit Committee Charter, the Audit Committee Defendants, defendants Brown, Davis, and Stonehouse owe and/or owed specific additional duties to Bellicum.  According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing "the Company's corporate accounting and financial reporting processes, the systems of internal control over financial reporting, and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports."  Further, the Audit Committee is responsible for

assisting the Board in overseeing "the Company's legal, regulatory and ethical compliance programs."  In overseeing the Company's financial reporting process on behalf of the Board, the Audit Committee is tasked with the following functions:

10.    ***Management's Discussion and Analysis.*** To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports or Registration Statements to be filed with the Securities and Exchange Commission.

11.    ***Press Releases.*** To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material financial developments and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions with respect to the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of such discussions.

12.    ***Accounting Principles and Policies.*** To review and discuss with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("***GAAP***") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, and significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements.

13.    ***Risk Assessment and Management.*** To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures; and to review and discuss with management insurance programs, including director and officer insurance, product liability insurance and general liability insurance (but excluding compensation and benefits related insurance).

* * *

18.    ***Internal Control Over Financial Reporting.*** To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting including significant deficiencies or material weaknesses identified by the Company's Auditors. To review with management and the Auditors any fraud, whether or not material, that includes management or other employees who have any significant role in the Company's internal control over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses.

\* \* \*

23.    ***Ethical Compliance; Compliance with Legal and Regulatory Requirements.*** To review reports from management and the Auditors regarding the adequacy and effectiveness of the Company's procedures to monitor and ensure compliance with its legal and regulatory responsibilities, including the Company's disclosure controls and procedures, as well as its Code, and regarding legal matters and compliance with legal and regulatory requirements that may have a material effect on the Company's business, financial statements or compliance policies, including any material reports or inquiries from regulatory or governmental agencies.

24.    ***Regulatory and Accounting Initiatives.*** To review with counsel, the Auditors, and/or management, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements, or compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

**Breaches of Duties**

30.    Each Individual Defendant, by virtue of his position as an officer and/or director, owed to Bellicum the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Bellicum, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being

aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Bellicum's Board during the time of the misconduct.

31.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Bellicum to make improper statements to the public and the Company's stockholders, an unlawful practice that wasted Bellicum's assets and caused the Company to incur substantial damage.  The Individual Defendants also breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Bellicum to issue the misleading 2017 Proxy.

32.     The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements and failing to properly oversee Bellicum's public statements and internal control function.

33.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Bellicum, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of federal securities laws.  As a result, Bellicum has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Bellicum, as to the Company's operations, financial condition, and future business prospects; and (ii) enhance the Individual Defendants' executive and directorial positions at Bellicum and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

36.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

37.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

38.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in

the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## **FACTUAL BACKGROUND**

40.     Bellicum is a clinical-stage biopharmaceutical company that develops novel drugs to treat various forms of cancer, including hematological cancers and solid tumors, as well as orphan inherited blood disorders.  None of the drugs that Bellicum has produced have received FDA approval.  According to Bellicum's Annual Report on Form 10-K for the fiscal year ended December 31, 2017, filed with the SEC on March 13, 2018, the Company had a net loss of $91.8 million on revenue of approximately $185,000 for 2017.  Due to loss of income for the foreseeable future, Bellicum is dependent on raising money from the market, either through stock sales or debt issuances, in order to continue to fund its operations.  The Company's stock price, therefore, is of critical importance to how much and on what terms Bellicum can raise money.  Both its stock price and other ways to raise money are dependent on purchasers and lenders' ability to trust that the Company and its fiduciaries are truthful when discussing Bellicum's drug programs.

41.     Bellicum began developing its lead drug, BPX-501, with the hope that it would become the Company's first drug to gain FDA approval and reach the market.  The drug was designed to improve transplant outcomes for patients undergoing haploidentical (partial match) stem cell transplants by enhancing the recovery of the immune system following an HSCT

procedure and providing control over viral infections.  According to Bellicum's public filings with the SEC, "adoption of HSCT to date has been limited by the risks of transplant-related morbidity and mortality from graft-versus-host-disease, or GvHD, and the potential for serious infections due to the lack of an effective immune system following a transplant."  In seeking to address these challenges, the Company created a proprietary Chemical Induction of Dimerization ("CID") technology platform to engineer its products with switch technologies and thereby control components of the immune system in real time.  By incorporating its CID platform with BPX-501, the Company hoped to "provide better overall transplant outcomes – faster immune recovery, lower rates of infection and lower rates of disease relapse – than one would generally expect from an alternative allogeneic transplant procedure."  Of the Company's clinical stage product candidates, BPX-501 is the furthest along in the pipeline.

42.     Given that BPX-501 was slated to be the Company's first drug that could be commercially sold, the drug was vital to Bellicum's eventual profitability and growth.  As such, the Individual Defendants and the market in general, have paid particularly close attention to BPX-501 and its clinical developments.

43.     In order for the FDA to approve BPX-501, Bellicum had to conduct clinical trials to prove that the drug is safe and effective.  In its Annual Report on Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC on March 13, 2017, the Company represented that BPX-501 was being evaluated in multiple Phase 1/2 clinical trials in the U.S. and Europe.

## SUBSTANTIVE ALLEGATIONS

**The Individual Defendants' Breaches of Duty Result in a Series of Improper Statements**

44.     As detailed below, between May 2017 and November 2017, the Individual Defendants made or allowed the Company to make improper statements in its public filings concerning its leading product, BPX-501.

45.     On May 8, 2017, Bellicum issued a press release announcing the Company's financial and operating results for the first quarter March 31, 2017.  The press release highlighted positive data about BPX-501 and the clinical trials in which the drug was tested.  Specifically, the press release claimed that "data from the BP-004 trial … showed a low incidence of transplant-related mortality, rapid immune recovery, a low rate of GvHD…, and no serious adverse events associated with the use of BPX-501 or rimiducid."  The press release stated:

> "We had a productive first quarter across our pipeline," said Rick Fair, Bellicum's President & Chief Executive Officer. "We continued to make progress on the registration trial for BPX-501, and presented updated clinical data highlighting its potential to transform patients' lives. We are actively recruiting initial clinical trials with our controllable CAR T and TCR product candidates, and presented preclinical data on exciting new enhancements to our pioneering technology platform. This progress underscores our commitment to developing novel cell therapies in areas of dire need."
>
> **PROGRAM HIGHLIGHTS AND CURRENT UPDATES**
>
> **BPX-501**
> ***Adjunct T-cell therapy, administered after allogeneic hematopoietic stem cell transplantation, to support faster immune recovery, improved infection control, and reduced mortality and Graft versus Host Disease (GvHD).***
>
> **Registration Studies Advancing in the European Union**
>
> Bellicum continues to enroll its registration trial in the E.U. with BPX-501 and rimiducid in pediatric patients with orphan inherited blood disorders or hematologic cancers receiving a haploidentical transplant, and is preparing to initiate a separate observational trial in a comparative sample of patients receiving a matched unrelated donor, or MUD, transplant to support regulatory submission.
>
> **Preparation Ongoing for U.S. Registration Trials**
>
> Bellicum continues to prepare for pivotal trials of BPX-501 in the U.S. in pediatric patients with orphan inherited blood disorders and blood cancers and in adults with high- and intermediate-risk AML receiving haploidentical transplant.
>
> **Data Update Highlights Promise of BPX-501 Clinical Program**
>
> At the Bone Marrow Transplant (BMT) Tandem Meeting in February, Bellicum reported data from the BP-004 trial which showed a low incidence of transplant-related mortality, rapid immune recovery, a low rate of GvHD that was

manageable with standard treatments or rimiducid, and no serious adverse events associated with the use of BPX-501 or rimiducid.

46. On August 8, 2017, Bellicum issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2017.  In the press release, the Individual Defendants published several updates that highlighted promising developments and gave the impression to the public that BPX-501 was smoothly progressing through its clinical studies.  The press release stated:

**BPX-501**
*Adjunct T-cell therapy incorporating the CaspaCIDe® safety switch, administered after a haploidentical hematopoietic stem cell transplant (haplo-HSCT), to improve outcomes and reduce mortality.*

**Data Update Suggests BPX-501 Improves Outcomes of Haploidentical Stem Cell Transplants**
During the Presidential Symposium of the 22nd Congress of the European Hematology Association (EHA) in June, Bellicum reported data from 98 pediatric patients within the BP-004 trial which showed rapid immune recovery, a low incidence of transplant-related mortality, a reduction in viral infections and a low rate of Graft versus Host Disease (GvHD) that was manageable with either standard treatments or rimiducid. The data suggest BPX-501 could improve outcomes of haploidentical stem cell transplants, providing an option for the many patients who could benefit from a life-saving transplant but lack a matched donor.

**Positive Clinical Results of BPX-501 in Pediatric Leukemias**
Also at EHA, Bellicum reported data from the BP-004 trial in a cohort of 47 pediatric patients with acute leukemias who lack a matched donor. The data showed rapid immune reconstitution and low rates of relapse and mortality, suggesting that BPX-501 may offer benefits in combination with HSCT in acute leukemia patients.

**European BP-004 Pivotal Clinical Trial Progressing**
Enrollment in the pivotal EU BP-004 trial remains on track for completion by the end of 2017. Bellicum expects to initiate an observational trial in pediatric patients receiving transplants from matched unrelated donors (MUD) without BPX-501 in the third quarter. Outcomes from these trials are expected to be the basis for filings of European Marketing Authorization Applications for BPX-501 and rimiducid. The Company expects to report topline results of these studies in the second half of 2018, with MAA filings planned for 2019.

**Company Clarifies U.S. Clinical Development Strategy**
Bellicum is finalizing plans for the design of registrational trials of BPX-501 in the U.S. The Company's current plans include conducting a controlled clinical trial in adult patients with acute myeloid leukemia (AML), which it expects to fund in part through its $16.9 million Product Development Award from the Cancer Prevention and Research Institute of Texas ("CPRIT"). In the pediatric nonmalignant setting, Bellicum is designing a registrational trial to evaluate BPX-501 in a distinct subset of orphan inherited blood disorders.

47.     On November 7, 2017, Bellicum issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2017.  In the press release, Bellicum continued to make positive assertions about BPX-501 and the progress of its clinical studies.  The press release stated:

"We made good progress advancing our pipeline in the third quarter. Enrollment in our clinical program for BPX-501 remains on track and we progressed our plans for future trials in adult AML and a pediatric orphan blood disorder," said Rick Fair, Bellicum's President & Chief Executive Officer. "On BPX-601, we modified our Phase 1 trial to accelerate evaluation of our first clinical GoCAR-T candidate, and we look forward to reporting preliminary results next year. Finally, we continued to advance several exciting preclinical programs, leveraging our dual-switch controllable cell therapy platform."

**PROGRAM HIGHLIGHTS AND CURRENT UPDATES**

**BPX-501**
*Adjunct T-cell therapy incorporating the CaspaCIDe® safety switch, administered after a haploidentical hematopoietic stem cell transplant (haplo-HSCT), to improve outcomes and reduce mortality.*

**Bellicum Continues to Advance its BPX-501 Program**
Enrollment in the EU BP-004 clinical trial remains on track to be complete by the end of 2017. Bellicum has also initiated C-004, an observational trial in pediatric patients receiving transplants from matched unrelated donors (MUD) without BPX-501. The outcomes of both trials could form the basis for filings of European Marketing Authorization Applications for BPX-501 and rimiducid. A BPX-501 abstract, highlighting data on immune reconstitution from the EU BP-004 clinical trial, has been accepted for an oral presentation at the upcoming 59th Annual Meeting of the American Society of Hematology (ASH) in December.

**Company Prepares for Additional BPX-501 Trials in U.S.**
Planning is ongoing for two additional trials of BPX-501 to expand the eligible patient population and support potential U.S. registration. These trials are being

- 21 -

developed in adult patients with acute myeloid leukemia (AML) and in a distinct orphan inherited blood disorder patient population.

48.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:   (i) that a substantial undisclosed risk of encephalopathy was associated with the Company's lead product candidate, BPX-501; and (ii) as a result of the foregoing, the Individual Defendants' representations concerning the drugs were improper.

**Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse Negligently Make Misleading Statements in Bellicum's 2017 Proxy**

49.     On April 26, 2017, Bellicum issued its 2017 Proxy for the Annual Meeting of Stockholders.   In the 2017 Proxy, defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse solicited stockholder votes to, among other things: (i) reelect defendants Fair, Daly, and Huber to the Board; and (ii) approve an amendment to Bellicum's 2014 Equity Incentive Plan (the "Equity Plan") to increase the number of shares available under the Equity Plan.   Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse negligently issued misleading statements with respect to each of these solicited votes.

50.     Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Misstatements in Support of Reelecting Defendants Fair, Daly, and Huber**

51.     In the 2017 Proxy, defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse solicited votes to reelect defendants Fair, Daly, and Huber to the Board. In support of their bid to reelect defendants Fair, Daly, and Huber, these defendants highlighted their supposed successful oversight of the Company.  In particular, the 2017 Proxy described their responsibilities and the duties of each committee.  Additionally, the 2017 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company; and (ii) the Audit Committee exercised oversight of the Company's financial statements, earnings announcements, and other public announcements.

52.     With respect to the Board's oversight of risk, the 2017 Proxy stated:

**ROLE OF THE BOARD IN RISK OVERSIGHT**
One of the key functions of our Board is informed oversight of our risk management process. Our Board does not have a standing risk management committee, but rather administers this oversight function directly through the Board as a whole, as well as through various standing committees of our Board that address risks inherent in their respective areas of oversight. In particular, our Board is responsible for monitoring and assessing strategic risk exposure and the Audit Committee has the responsibility to consider and discuss our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. The Audit Committee also monitors compliance with legal and regulatory requirements. The Nominating and Governance Committee monitors the effectiveness of our corporate governance practices, including whether they are successful in preventing illegal or improper liability-creating conduct. The Compensation Committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

53.     With respect to the key oversight responsibilities of the Board's Audit Committee, the 2017 Proxy stated:

**Audit Committee**

*   *   *

- 23 -

The Audit Committee of the Board was established by the Board in accordance with Section 3(a)(58)(A) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to oversee the Company's corporate accounting and financial reporting processes and audits of its financial statements. For this purpose, the Audit Committee performs several functions, including, among other things:

\* \* \*

- reviewing our annual and quarterly financial statements and reports, including the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discussing the statements and reports with our independent auditors and management;

- reviewing, with our independent auditors and management, significant issues that arise regarding accounting principles and financial statement presentation and matters concerning the scope, adequacy and effectiveness of our financial controls;

\* \* \*

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding financial controls, accounting or auditing matters and other matters;

- preparing the report that the SEC requires in our annual proxy statement;

- reviewing and providing oversight of any related-party transactions in accordance with our related-party transaction policy and reviewing and monitoring compliance with legal and regulatory responsibilities, including our code of business conduct and ethics;

- reviewing our major financial risk exposures, including the guidelines and policies to govern the process by which risk assessment and risk management are implemented;

- reviewing, on a periodic basis, our investment policy; and

- reviewing and evaluating, on an annual basis, the performance of the Audit Committee and the Audit Committee charter.

54.     Through these statements, defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing

and apprise the Board of significant risks; (ii) was well informed of the Company's operations through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board and Audit Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and public disclosures.  Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse were negligent in including these misleading statements in the 2017 Proxy.

55.     The 2017 Proxy harmed Bellicum by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in the 2017 Proxy, Bellicum's stockholders voted via an uninformed stockholder vote to reelect defendants Fair, Daly, and Huber to Bellicum's Board.

**Misstatements in Support of Vote to Approve the Amendment to Bellicum's Equity Plan to Increase the Number of Shares Available Under the Plan**

56.     Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse also negligently made misrepresentations in the 2017 Proxy in support of a stockholder vote for approval of an amendment of the Equity Plan to increase the number of shares available for issuance under the plan.  The Equity Plan sought to increase the total number of shares that can be issued under the plan by 3.1 million shares, with dilutive effects.  In support of the requested approval, the 2017 Proxy stated that the Company's equity incentive programs were designed to "build stockholder value" and were critical to Bellicum's "long-term success."  Further, the 2017 Proxy assured investors that the Board "carefully monitor[s] the equity compensation" to "ensure these awards continue to provide incentives for the recipients to work towards [Bellicum's] success."  The 2017 Proxy stated:

> *We believe it is critical for our long-term success that the interests of our employees and directors are tied to our success as "owners" of our business. The equity incentive programs we have in place are intended to build stockholder value by attracting and retaining talented employees and directors.*

We believe we must continue to offer a competitive equity compensation packages in order to retain and motivate the talent necessary for our continued growth and success. ***We carefully monitor the equity compensation and equity holdings of our employees, directors and consultants as well as the type of equity awards we grant to ensure these awards continue to provide incentives for the recipients to work towards our success.*** Traditionally, stock options have been the primary component of our equity program. ***The potential value of stock options is realized only if our share price increases, and so stock options provide a strong incentive for individuals to work to build stockholder value.*** Recently, in line with market practices, we began granting restricted stock unit awards to certain employees at levels that minimize dilution with an appreciation of the value transfer.

As of April 17, 2017, we had 494,681 shares remaining available for grant under the 2014 Plan. Bellicum has and is expected to continue to experience significant growth in personnel as we progress our business, expand our pipeline, manufacturing capabilities and technology platform, and advance our lead BPX-501 product candidate through pivotal studies and prepare for commercialization in both Europe and the U.S. ***If our stockholders do not approve the Amended 2014 Plan, the Company strongly believes that it will be unable to successfully use equity as part of its compensation program, as most of its competitors in the industry do, putting the Company at a significant disadvantage and compromising its ability to enhance stockholder value. Therefore, we believe that approval of this request is in the best interest of our stockholders and our Company.***

\* \* \*

***Accordingly, we are requesting that our stockholders approve the Amended 2014 Plan, which includes terms regarding eligibility for performance-based awards, annual per-employee limits and the business criteria upon which the performance goals for performance-based awards may be based (as described in the summary below).*** We believe it is in the best interests of Bellicum and our stockholders to preserve the ability to grant awards in the future that may qualify as "performance-based compensation" under Section 162(m) of the Code.

57.    Certain of the shares available for issuance under the Equity Plan were subject to performance goals.  The 2017 Proxy provided that grants of equity-based incentive awards would occur periodically "in order to specifically incentivize employees, including [Bellicum's] executives with respect to achieving certain corporate goals or to reward such employees for exceptional performance."  The 2017 Proxy provides that the performance goals that the Compensation Committee may select include, among other things: (i) stock price; (ii) market

share; (iii) submission to, or approval by, a regulatory body (including the FDA) of an applicable filing or a product; and (iv) progress of internal research or development programs. These performance criteria do not incentivize Bellicum's fiduciaries to work towards the Company's long-term success. Rather, the material terms of the performance goals in the Equity Plan actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices, which furthered only short-term growth while rewarding executives overseeing such endeavors.

58.     Bellicum's performance goals have historically been tied directly to the Company's lead product candidate, BPX-501.  The Company's corporate goals for 2016, for example, included preclinical development goals, clinical development goals, business development goals and financial goals.  The clinical development goals were directly related to the BPX-501 clinical program.  Given this direct correlation, Bellicum's performance goals incentivized the Company's fiduciaries to conceal any adverse facts about BPX-501.

59.     In particular, Bellicum's Equity Plan incentivized Company fiduciaries to continue the BPX-501 trials without regard to safety or the likelihood of success.  According to the 2017 Proxy, stock options are the primary component of the Company's equity program.  As the Company concedes in the 2017 Proxy, "[t]he potential value of stock options is realized only if [the Company's] share price increases."  Thus, the Equity Plan incentivized Bellicum's fiduciaries to conceal any adverse information about the Company's business and operations, including the substantial undisclosed risk of encephalopathy that was associated with BPX-501.

60.     As a result of the misleading statements in the 2017 Proxy, Bellicum's stockholders voted for the increase in shares for distribution under the Equity Plan.  This vote was made without the benefit of material information regarding the defendants' continued and

ongoing failure to address Bellicum's inadequate compliance, internal control, disclosure review, and reporting programs.

## THE TRUTH EMERGES

61.     The truth behind Bellicum's business prospects emerged on January 30, 2018, after the market closed, when the Company issued a press release titled "Bellicum Pharmaceuticals Announces Clinical Hold on BPX-501 Clinical Trials in the United States."  In the press release, the Company announced that it had "received notice from the U.S. Food and Drug Administration (FDA) that U.S. studies of BPX-501 have been placed on a clinical hold following three cases of encephalopathy deemed as possibly related to BPX-501."  The press release stated:

> HOUSTON, Jan. 30, 2018 (GLOBE NEWSWIRE) -- Bellicum Pharmaceuticals, Inc. (NASDAQ:BLCM), a leader in developing novel, controllable cellular immunotherapies for cancers and orphan inherited blood disorders, today announced that the Company has received notice from the U.S. Food and Drug Administration (FDA) that U.S. studies of BPX-501 have been placed on a clinical hold following three cases of encephalopathy deemed as possibly related to BPX-501. Bellicum is awaiting formal communications from the FDA to determine the requirements for resuming studies, and will be working closely with the FDA to address their questions. The FDA clinical hold does not affect the ongoing BP-004 registration trial in Europe.
>
> Encephalopathy has been reported in the allogeneic stem cell transplant literature. Risk factors for encephalitis/encephalopathy after allogeneic stem cell transplants include prolonged immunodeficiency, selected medications, infections, and inflammatory processes such as graft versus host disease. Bellicum has treated more than 240 patients with BPX-501 cells on three allogeneic haploidentical stem cell transplantation protocols. These three cases are complex, with a number of potential confounding factors—including, in certain of the cases, prior failed transplants, prior history of immunodeficiency, concurrent infection, and administration of rimiducid in combination with other medications. Bellicum is working with FDA to evaluate the risk of encephalopathy in patients receiving BPX-501.

62.     On this news, Bellicum's stock price fell more than 25%, or $2.12 per share, on January 31, 2018, to close at $6.08 per share compared to the previous trading day's closing of

$8.20 per share, erasing more than $70 million in market capitalization in a single day.   In addition, after the truth about the safety and efficacy of BPX-501 emerged, the Securities Class Action was filed against Bellicum alleging violations of federal securities laws.

## DAMAGES TO BELLICUM

63.     As a result of the Individual Defendants' improprieties, Bellicum disseminated improper, public statements concerning BPX-501.   These improper statements have devastated Bellicum's credibility as reflected by the Company's $70 million, or 25%, market capitalization loss.

64.     The Individual Defendants' improper course of conduct has also subjected the Company to potentially tens of millions of dollars in damages in connection with the Securities Class Action filed in the U.S. District Court for the Southern District of Texas.   The Securities Class Action alleges that the Company and certain Individual Defendants, including defendants Fair and Musso, violated federal securities laws by repeatedly misrepresenting the safety and efficacy of BPX-501.

65.     Bellicum's improper statements also severely damaged its reputation within the business community and in the capital markets.   In addition to price, Bellicum's current and potential investors consider a Company's trustworthiness, stability, and ability to evaluate known risks.   Investors are less likely to invest in companies that disseminate improper statements and fail to comply with their own internal protocols and external regulations.   Accordingly, Bellicum's ability to attract investors is now impaired.   In addition, Bellicum's ability to raise equity capital or debt on favorable terms in the future is now impaired.   The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading

projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

66.     Further, as a direct and proximate result of the Individual Defendants' actions, Bellicum has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

        (a)     costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

        (b)     costs incurred to investigate wrongdoing; and

        (c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Bellicum.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiff brings this action derivatively in the right and for the benefit of Bellicum to redress injuries suffered, and to be suffered, by Bellicum as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Bellicum is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

68.     Plaintiff will adequately and fairly represent the interests of Bellicum in enforcing and prosecuting its rights.

69.     Plaintiff was a stockholder of Bellicum at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Bellicum stockholder.

70.     The current Board of Bellicum consists of the following eight individuals: defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse, and nondefendant

Edmund P. Harrigan ("Harrigan").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Their Misconduct**

71.     As alleged above, seven out of eight of the current Board, including Director Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2017 Proxy.  Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse are responsible for the negligently made statements in the materially misleading 2017 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, an indemnification provided by the Company to defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse does not protect them for violations of section 14(a).  As a result, defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse face a substantial likelihood of liability, excusing a demand.

72.     In addition, as alleged above, seven out of eight of the current Board, including Director Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse, breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the safety and efficacy of the Company's lead product candidate, BPX-501.  In making these improper and misleading statements, defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse breached their fiduciary duties.  Accordingly, all the members of the Board face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

73.     Defendants Brown, Davis, and Stonehouse, as members of the Audit Committee, reviewed and approved the improper statements.  The Audit Committee's Charter provides that the Audit Committee is responsible for reviewing and discussing with management earnings press releases, and other press releases containing material financial developments.  The Audit Committee's Charter further tasks the Audit Committee members with the obligation to review the Company's major financial risk exposures.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements detailed herein. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Brown, Davis, and Stonehouse face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

74.     The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, and Stonehouse face a substantial likelihood of liability for repeatedly failing to comply with this duty.

75.     Any suit by the current directors of Bellicum to remedy these wrongs would expose defendant Fair, and Bellicum, to liability for violations of the federal securities laws in the pending Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants.  The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendant Fair in this action, then Bellicum's efforts

would compromise its defense of the Securities Class Action. Accordingly, demand on the Board is excused.

**Demand Is Excused as to Defendant Fair Because He Lacks Independence**

76.     As a preliminary matter, Bellicum has conceded in its SEC filings that defendant Fair is not an independent director. Specifically, in the 2017 Proxy, defendant Fair is not listed as one of Bellicum's allegedly independent directors. Furthermore, defendant Fair has been CEO of Bellicum since January 2017. Defendant Fair is not an independent director because the principal professional occupation of defendant Fair is his employment with Bellicum, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Fair lacks independence from defendants Brown, Daly, Davis, Huber, McGuyer, and Stonehouse due to his interest in maintaining his executive position at Bellicum. This lack of independence renders defendant Fair incapable of impartially considering a demand to commence and vigorously prosecute this action. Bellicum paid defendant Fair the following compensation:

| Year | Salary | Option Awards | Nonequity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $494,532 | $3,839,408 | $534,731 | $13,791 | $4,882,462 |

Accordingly, defendant Fair is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Fair.

**Demand Is Excused as to Defendants Davis, Daly, and Huber and Nondefendant Harrigan Due to Their Overlapping Business Affiliations**

77.     Director Defendants Davis, Daly, and Huber and nondefendant Harrigan are incapable of impartially considering a demand to commence and vigorously prosecute this action

due to their long-standing overlapping business relationships.  Defendants Davis, Daly, and Huber and nondefendant Harrigan are very active in the healthcare world, which has created many entangling relationships with other Board members.  In particular:

(a)     Defendants Davis and Daly, and nondefendant Harrigan all serve on the board of directors of ACADIA Pharmaceuticals Inc. ("ACADIA"), a biopharmaceutical company focused on the development of innovative medicines to address medical needs in central nervous system disorders.  Defendant Davis has been president, CEO, and a director of ACADIA since September 2015.  Defendant Daly has been a director of ACADIA since January 2016, and Harrigan has been a director of ACADIA since November 2015.

(b)     Defendant Davis and nondefendant Harrigan were employed concurrently at Neurogen Corporation ("Neurogen"), a development company that was focused on new small molecule drugs to address psychiatric and neurological disorders.  Defendant Davis was a director of Neurogen from September 2001 until December 2009 and the CEO of Neurogen from February 2008 until December 2009, when Neurogen was acquired by Ligand Pharmaceuticals, Inc.  Nondefendant Harrigan was Neurogen's Executive Vice President and Chief Development Officer from May 2002 until March 2003.

(c)     Defendants Daly and Huber were employed concurrently at Incyte Corporation ("Incyte"), a biopharmaceutical research company focused on oncology product development.  Defendant Daly was the Executive Vice President and Chief Commercial Officer of Incyte from October 2012 until June 2015.  Defendant Huber is the Executive Vice President and Chief Scientific Officer of Incyte and has been since April 2014.  Defendant Huber's employment at Incyte began in January 2002, when he was Associate Director, Applied Technology.

78.    Defendants Davis, Huber, and Daly and nondefendant Harrigan received the following compensation from their employment at the aforementioned companies:

| Davis, Stephen R. Compensation | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Company | Salary | Bonus | Other Annual Compensation | Option Awards | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| ACADIA Pharmaceuticals Inc. | $2,075,249 | $740,158 | - | $38,278,339 | - | $535,938 | $131,898 | $41,761,582 |
| Neurogen Corporation | $2,084,572 | $327,921 | $48,709 | $2,145,590 | $969,500 | $155,186 | $100,717 | $5,832,195 |
| | | | | | | | TOTAL: | $47,593,777 |

| Huber, Reid M. Compensation | | | | | | |
|---|---|---|---|---|---|---|
| Company | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| Incyte Corporation | $1,731,527 | $7,626,611 | $2,388,154 | $1,194,648 | $114,534 | $13,055,474 |
| | | | | | TOTAL: | $13,055,474 |

| Daly, James M. Compensation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Company | Salary | Fees Paid in Cash | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
| ACADIA Pharmaceuticals Inc. | - | $129,750 | $1,109,641 | - | - | $997 | $1,240,388 |
| Incyte Corporation* | $1,104,526 | - | $3,597,446 | $320,039 | $884,765 | $260,324 | $6,167,100 |
| | | | | | | TOTAL: | $7,407,488 |

| Harrigan, Edmund P. Compensation | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Company | Salary | Fees Paid in Cash | Bonus | Other Annual Compensation | Option Awards[1] | Restricted Stock Awards | All Other Compensation | Total |
| ACADIA Pharmaceuticals Inc. | - | $120,000 | - | - | $1,242,785 | - | $167,342 | $1,530,127 |
| Neurogen Corporation* | $145,577 | - | $19,500 | $8,375 | $67,725 | $480,000 | $315 | $721,492 |
| | | | | | | | TOTAL: | $2,251,619 |

79.    There is a reasonable doubt that defendants Davis, Daly, and Huber and nondefendant Harrigan would vote to initiate litigation against each other due to these long-standing business relationships.   As a result of these long-standing and extensive professional entanglements, defendants Davis, Daly, and Huber and nondefendant Harrigan are incapable of impartially considering a demand to commence and vigorously prosecute this action.   Demand is therefore futile as to defendants Davis, Daly, and Huber and nondefendant Harrigan.

80.     Plaintiff has not made any demand on the other stockholders of Bellicum to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Bellicum is a publicly held company with over 42.8 million shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse for Violation of Section 14(a) of the Exchange Act**

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

83.     Director Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017 Proxy.  In the

2017 Proxy, the Board solicited stockholder votes to reelect defendants Fair, Daly, and Huber to the Board and approve the amendment of the Equity Plan to increase the number of shares available under the plan.

84.     By reasons of the conduct alleged herein, Director Defendants Brown, Daly, Davis, Fair, Huber, McGuyer, Slawin, and Stonehouse violated section 14(a) of the Exchange Act.  As a direct and proximate result of these Director Defendants' wrongful conduct, Bellicum misled and/or deceived its stockholders by making misleading statements that were essential links in stockholders heeding Bellicum's recommendation to reelect defendants Fair, Daly, and Huber and increase the number of shares to be distributed under the Equity Plan, with dilutive effects.

85.     Plaintiff, on behalf of Bellicum, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Fair, Daly, and Huber based upon the false and misleading 2017 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     As alleged in detail herein, the Individual Defendants by reason of their positions as officers and directors of Bellicum and because of their ability to control the business and corporate affairs of Bellicum, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Bellicum in a fair, just, honest, and equitable manner.

88.     Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

89.     The Officer Defendants were reckless, or were grossly negligent in disseminating the improper statements detailed herein.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that a substantial undisclosed risk of encephalopathy was associated with Bellicum's lead product candidate, BPX-501.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

90.     The Director Defendants as directors of the Company, owed Bellicum the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly disseminating, or permitting the Company to disseminate, the improper statements detailed herein.  The Director Defendants knew or were reckless in not knowing that a substantial undisclosed risk of encephalopathy was associated with Bellicum's lead product candidate, BPX-501.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

91.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

92.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bellicum has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

93.     Plaintiff, on behalf of Bellicum, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     As a result of the Individual Defendants' misleading statements, the Individual Defendants have caused Bellicum to incur substantial costs.

96.     In addition, as a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Bellicum is subject to the Securities Class Action.  The Individual Defendants have caused Bellicum to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

97.     Further, the Individual Defendants have caused Bellicum to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

98.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

99.     Plaintiff, on behalf of Bellicum, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

100.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Bellicum.  The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Bellicum.

102.    Plaintiff, as a stockholder and representative of Bellicum, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

103.    Plaintiff, on behalf of Bellicum, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Bellicum, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Bellicum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bellicum and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over reporting of clinical trials and developmental drugs;

2.    a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and public;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a provision to permit the Company to hold new director elections on the basis of a special proxy with appropriate corrective disclosures; and

5.      a provision to permit the stockholders of Bellicum to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Bellicum has an effective remedy;

D.      Awarding to Bellicum restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated:  July 19, 2018                           Respectfully submitted,

                                                KENDALL LAW GROUP, PLLC


                                                /s/ Joe Kendall
                                                JOE KENDALL
                                                State Bar No. 11260700
                                                jkendall@kendalllawgroup.com
                                                JAMIE J. MCKEY
                                                State Bar No. 24045262
                                                jmckey@kendalllawgroup.com

3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas  75219
Telephone: (214) 744-3000
Facsimile:  (214) 744-3015

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
ssanders@robbinsarroyo.com

ATTORNEYS FOR PLAINTIFF

1266451

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SEUNG PAIK, Derivatively on Behalf of BELLICUM PHARMACEUTICALS, INC.

**(b)** County of Residence of First Listed Plaintiff    San Francisco, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

SEE ATTACHED LIST

## DEFENDANTS

SEE ATTACHED LIST

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Violation of the Securities and Exchange Act

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE  Judge Alfred H. Bennett    DOCKET NUMBER  4:18-cv-00338

DATE
07/19/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joe Kendall

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

I. (a) DEFENDANTS

RICHARD A. FAIR
ALAN A. MUSSO
JAMES BROWN
FRANK B. MCGUYER
REID M. HUBER
JON P. STONEHOUSE
STEPHEN R. DAVIS
JAMES M. DALY, and
KEVIN M. SLAWIN
BELLICUM PHARMACEUTICALS, INC.

I. (c) PLAINTIGFF'S ATTORNEYS

**KENDALL LAW GROUP, PLLC**
JOE KENDALL
jkendall@kendalllawgroup.com
JAMIE J. MCKEY
jmckey@kendalllawgroup.com
3811 Turtle Creek Blvd.
Suite 1450
Dallas, TX 75219
Telephone:  (214) 744-3000
Facsimile:  (214) 744-3015

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS
FELIPE J. ARROYO
SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
farroyo@robbinsarroyo.com
ssanders@robbinsarroyo.com